# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-1997
Filed March 11, 2026

————————————

**In the Interest of L.L., Minor Child,**

**O.L., Mother,**
Appellant.

————————————

Appeal from the Iowa District Court for Polk County,
The Honorable Susan Cox, Judge.

————————————

**AFFIRMED**

————————————

ConGarry Williams, Juvenile Public Defender Office, Des Moines, attorney for appellant mother.

Brenna Bird, Attorney General, and Michelle R. Becker, Assistant Attorney General, attorneys for appellee State.

Lisa A. Allison of Youth Law Center, Des Moines, attorney and guardian ad litem for minor child.

————————————

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Greer, P.J.

1

**GREER, Presiding Judge.**

A mother appeals the termination of her parental rights to one child, arguing that termination is not in the child's best interests. On our de novo review of the record, we affirm the termination of the mother's parental rights.

## I. Background Facts and Proceedings.

The child, L.L., was born in October 2020 in California.[1] In March 2024, the mother and child moved from California to Iowa. The child has been involved with child protective services in both California and Iowa for the majority of his life.

The mother has several mental-health diagnoses, including severe depression and psychosis. On April 18, 2024, the mother was admitted to a psychiatric unit in Council Bluffs, leaving the child without a caretaker. The mother remained hospitalized for ten days. The juvenile court removed the child from mother's custody and placed the child in the custody of the Iowa Department of Health and Human Services (HHS), which then placed the child in foster care.

After the mother's discharge from the hospital, she moved to Des Moines to live with her godmother, the child's fictive kin. The child remained in foster care.

HHS coordinated for the mother to have weekly, in-person visits with the child. The mother repeatedly failed to take advantage of this visitation, often ending visits early. For example, on May 3, the mother opted for a

---

[1] The child's biological father is unknown. The rights to all putative and unknown fathers were terminated, and that decision has not been appealed.

phone visit instead of an in-person visit with the child. The child began to cry when the mother called him, and the mother told the child it was not polite to cry when someone is trying to talk to you. At another visit on May 10, after about an hour, the mother repeatedly asked the child if he was done and wanted to go home. The child began to cry. During another visit, the mother acknowledged the child had been in foster care for a majority of his life, stating, "we are just getting to know each other."

On May 31, the child was transferred from foster care to the care of the fictive kin. On June 14, the child was adjudicated as a child in need of assistance.[2]

On July 3, the mother moved out of the fictive kin's home, opting instead to live in a homeless shelter. The child remained in the fictive kin's care. A month or so later, the mother obtained her own housing with the assistance of the homeless shelter. She gave birth to another child in mid-October.[3]

In April 2025, after several issues arose with the fictive kin, the child was removed from the fictive kin's care and again placed in foster care. The child remained in foster care for the duration of this case.

On April 16, the juvenile court granted the mother an additional six months to work toward reunification. She was ordered to abstain from using substances, participate in random drug screens, and develop a treatment plan with her mental-health provider. Two days later, HHS requested the mother have a sweat patch drug test applied. At a staffing on May 2, the mother

---

[2] Venue of this case was transferred from Pottawattamie County to Polk County in July 2024.

[3] This child is the subject of separate juvenile court proceedings.

reported the patch had fallen off and she later threw it away. HHS requested the mother have another sweat patch placed, and on May 18, she tested positive for THC, methamphetamine, and cocaine. There continued to be issues with positive drug tests and tampering with sweat patches throughout this matter.

On May 23, the mother ended a visit with the child after forty-five minutes. The mother reportedly wanted to discuss the results of her drug test with the worker, who "redirected [the mother] to focus on her visit with her child[]." The mother failed to provide necessities for the child at this visit and became upset with the worker for not providing items for him.

On July 16, the child was moved from one foster family to another. HHS decided to only inform the mother of the foster parents' first names due to her repeatedly messaging the former foster parents. This led the mother to file police reports, an Ombudsman's report claiming that HHS was trafficking her children, and an email to a local news station with the child's photo attached stating he was missing.

The mother's cooperation with HHS became an issue, and on July 21, she revoked the releases for her healthcare providers and the child's healthcare providers, preventing HHS from obtaining details about their treatment. Further, in August, during a visit with the child, the mother told the child to tell the visit supervisor that the HHS social worker had hurt him at a visit. The child was visibly upset. After this incident, visits were reduced to once per week, fully supervised.

On September 8, the State filed a petition to terminate the mother's rights. The court held a termination hearing on September 24. At the

hearing, the HHS social worker and the guardian ad litem (GAL) recommended termination of the mother's parental rights.

In the GAL's report to the court, the GAL noted,

> Visits have been scaled back due to [the child]'s negative behaviors when he returns. He is withdrawn and quiet, similarly to when he was in [the fictive kin]'s care. He also started having "accidents" again after visits, which he had not done in some time. As a result, the Department and the undersigned agreed that the visitation schedule needed to decrease to protect [the child]'s mental health. The decrease in visits has greatly helped reduce those symptoms.

On November 11, the juvenile court entered an order terminating the mother's parental rights under Iowa Code section 232.116(1)(f) (2025). In terminating the mother's parental rights, the court noted that the mother continued to struggle with her mental health, substance use, and safety, which prevented her from parenting the child. Regarding whether termination was in the child's best interests, the juvenile court concluded:

> [The child] deserves to have a dedicated caregiver who prioritizes his basic needs and safety. He requires such a caregiver now and in the future. [The child] is approximately five years old and has waited almost his entire life- for a parent to be able to safely care for him. [The mother] cannot safely care for him. Her needs for therapy and treatment and safety are immense. [The mother] deserves all these things, but [the child] has waited and waited for permanency. Given the course of child welfare cases in California, Pottawattamie County and now Polk County, there is no evidence that a parent will be able to provide safety or stability for [the child] in the reasonably foreseeable future. Termination and adoption are in [the child]'s best interest.

> Furthermore, the court has considered whether another extension or guardianship would be in [the child]'s best interest or statutorily required. The court does not believe those legal options are in [the child]'s best interest or statutorily required. He has waited his entire life for permanency. [The child] deserves permanency and safety that can only be accomplished through termination of his parents' rights and adoption.

The mother appeals.

## II. Standard of Review.

We review termination of parental rights proceedings de novo. *In re Z.P.*, 948 N.W.2d 518, 522 (Iowa 2020). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* at 522–23 (citation omitted).

## III. Analysis.

On appeal, the mother does not contest the statutory grounds for termination, and we need not consider them. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) (noting that a parent's concession that a statutory ground for termination exists relieves the court of the obligation to discuss those grounds). Instead, the mother's sole argument on appeal is that termination is not in the child's best interests. *See* Iowa Code § 232.116(2).[4] Upon our de novo review of the record, we determine that termination of the mother's parental rights is in the child's best interests.

In deciding whether termination of parental rights is in the child's best interests we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). When considering the child's long term and immediate interests, the court must: "consider[] what the future holds for the child if returned to the parents. When making this decision, we look to the parents' past performance because it may indicate the quality of care the

---

[4] While the mother's petition on appeal makes a passing reference to Iowa Code section 232.116(3), the mother does not argue that an exception to termination applies under that provision based on the parent-child bond.

parent is capable of providing in the future." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) (citation omitted).

According to the mother, the juvenile court failed to give her testimony the appropriate weight, specifically her testimony about the strength of her bond with the child. The record of the mother's testimony, read most favorably to the mother, revealed only the following testimony she offered related to her bond with the child:

> I'm fully capable of taking care of them. I've been meeting with my mental—I have my mental report with me, so stable housing needs and medication as well as great visits with them, and I have a list of things I've done with them, and I'm not sure if they give the different reports to the social workers, but I do tons of things with my kids at visits. [The child] enjoys that. I bring my own items so he has items to return to at home if he came home.

However, there was substantial contrary testimony in the record. At the time of termination, the mother's visitation had been reduced to one fully supervised visit per week because of her behaviors and the negative effect visits had on the child. The HHS social worker testified about the quality of the mother's visits with the child as follows:

> She interacts very minimally with [the child]. She places electronics in front of the children's faces. They don't have a lot of interaction. [The mother] appears to be more focused on [the younger child] and his needs during the visit. I know when I supervised a visit in August of this year, I attempted to play a board game with [the child], and I don't know if that upset [the mother], but she asked him to move over to her, and then he played on a Gameboy.

The HHS social worker also testified that the child did not have an attachment to the mother, and that their relationship was strained:

> I believe that it is strained. [The child] is very quiet around Mom in my observations previously. He interacts a lot by himself. He is

struggling with transitions between visits with Mom and going back to the foster home, or even when he is with fictive kin, he struggles with the transition.

After reviewing all of the evidence, we conclude termination of the mother's parental rights is in the child's best interests. The child was almost five years old at the time of termination hearing and had been out of the mother's care for most of his young life. Despite having over a year to do so, the mother had not adequately addressed her mental health or substance use. Further, visits had a negative effect on the child, remained fully supervised, and had been reduced to once per week based on the mother's behaviors. The child deserves stability and permanency that only termination of the mother's parental rights can provide. *In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." (citation omitted)). For all of these reasons, we agree with the district court that termination was in the child's best interests.

## IV. Conclusion.

We conclude that termination of the mother's parental rights was in the child's best interests. We therefore affirm.

**AFFIRMED.**